AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
District of New Jersey

| | |
|---|---|
| United States of America<br>v.<br><br>JOSEPH R. BRODIE<br><br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.

    17-mj-2055 (JS)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  ___September 15 and 19, 2017___  in the county of  ___Cumberland___  in the

_____  District of  ___New Jersey___ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States code,<br>Section 115(a)(1)(B) | Threat to assault and murder a United States Official with the intent to impede, intimidate, and interfere with the official while engaged in the performance of official duties.<br><br>For further description of crime, see Attachment A. |

This criminal complaint is based on these facts:

See Attachment B, Affidavit.

◻ Continued on the attached sheet.

 

*Complainant's signature*

Joseph Furey, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___09/29/2017___

 

*Judge's signature*

City and state: ___Camden, New Jersey___

Hon. Joel Schneider, U.S.M.J.
*Printed name and title*

CONTENTS APPROVED

UNITED STATES ATTORNEY

By: _____

Assistant U.S. Attorney Sara A. Aliabadi

Date: September 29, 2017

## ATTACHMENT A

On or about September 15, 2017 and on or about September 19, 2017, in Cumberland County, in the District of New Jersey, and elsewhere, the defendant,

### JOSEPH R. BRODIE

did knowingly and willfully threaten to assault and murder a member of Congress and staff of that member of Congress, with the intent to impede, intimidate, and interfere with such officials while they were engaged in the performance of their official duties.

In violation of Title 18, United States Code, Section 115(a)(1)(B).

## ATTACHMENT B

I, Joseph P. Furey, Special Agent with the Federal Bureau of Investigation ("FBI"), have knowledge of the following facts based on my own investigation and upon conversations with other individuals involved in this investigation. I have not included in this Affidavit all of the facts known to me. Rather, I have included only those facts which I believe are necessary to establish probable cause. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part:

1. I have been employed as an FBI Special Agent for approximately thirty years. I am currently assigned to the Atlantic City Resident Agency ("ACRA") of the Newark Division, located in Northfield, New Jersey, where I investigate violent crimes, to include threats against members of Congress violations, Title 18, United States Code (U.S.C.), Section 115(a)(1)(B).

2. On September 21, 2017, detectives from the New Jersey State Police ("NJSP"), Port Norris Station, notified the FBI of several contacts that had taken place between a defendant named JOSEPH R. BRODIE (hereinafter "BRODIE") and various police troopers.

3. According to the NJSP detectives, the NJSP troopers' first contact with BRODIE – a veteran – occurred during a well-being check that the troopers performed on BRODIE's home in Cumberland County on or about May 5, 2017. The troopers performed this well-being check after NJSP Operational Dispatch Unit South received a phone call from the Department of Veteran's Affairs Clinic stating that the Clinic was unable to contact BRODIE.

4. When the NJSP troopers arrived at BRODIE's home address, they found a home trailer vehicle in which BRODIE appeared to be living. The troopers spoke with BRODIE, and BRODIE assured the troopers that he was fine and was not having any problems. BRODIE explained to the troopers that he had had a fever the night before and so he had been laying down for most of the day. BRODIE further explained that he did not receive good cell phone service in his trailer, which made it hard to contact anyone. NJSP troopers then contacted the Department of Veteran's Affairs Clinic and advised the Clinic that Brodie was okay.

5. The second contact that NJSP troopers had with BRODIE took place on or about August 24, 2017. The Department of Veteran's Affairs Clinic again telephoned the NJSP and requested a well-being check for BRODIE at the same address.

3

6. When the troopers arrived at BRODIE's home, they observed that BRODIE's trailer appeared to be vacant but there was a vehicle parked to the rear of the trailer. BRODIE came to the front door of his trailer and the troopers observed that he appeared to be aggravated that the troopers were on his property. The troopers explained to BRODIE that he had missed an appointment with the Clinic and they wanted to make sure he was okay.

7. BRODIE became agitated and expressed that he was frustrated with the Department of Veteran's Affairs. BRODIE told the troopers that he had acknowledged his appointment with the Clinic and but had cancelled it. The troopers sat down with BRODIE on his front porch and talked with him until he no longer appeared agitated. At no time did BRODIE display any signs of wanting to harm himself or others. Troopers explained to BRODIE that the Clinic had expressed concern for BRODIE due to his medical issues. Troopers also contacted the Clinic and updated the Clinic on their contact with BRODIE.

8. The third contact that NJSP troopers had with BRODIE occurred on or about September 20, 2017, after Port Norris Station received a phone call at their station from a civilian who knew BRODIE (hereinafter "Cooperating Witness-1" or "CW-1").[1] CW-1 requested a well-being check on BRODIE and suggested that BRODIE may be suicidal.

9. Uniformed troopers and detectives from the Port Norris Station responded to BRODIE's address to conduct the requested well-being check. When the troopers arrived, they observed BRODIE attempting to hide in his trailer. BRODIE ran from one end of his trailer to the other before exiting out the front door with a Russian SKS 7.62 X 39-style assault rifle.

10. BRODIE began yelling phrases such as, in sum and substance, "I don't want to shoot you!" Based on my training and experience, and in the context of this case, I believe that the person to whom BRODIE directed this threat was one of the troopers.

---

[1]     CW-1 has proven to be credible and reliable throughout law enforcement's investigation. Law enforcement has been able to corroborate CW-1's information by, among other things, comparing the text messages CW-1 described to law enforcement with the actual text messages set forth verbatim below. In addition, CW-1's information matched the events recounted by the victims of the threats described below and BRODIE's confession, also described in part below, including the dates and times of the events in question. CW-1 explained to law enforcement that CW-1 has a close, personal relationship with BRODIE, which BRODIE also confirmed during his Mirandized statement to law enforcement, set forth infra.

11. The troopers dropped down to take cover, drew their protective firearms, and gave BRODIE multiple verbal commands to drop his weapon. Instead of complying with the troopers' commands, BRODIE dropped to his knees, put the barrel of his rifle into his mouth, and pulled the trigger. The weapon did not fire. BRODIE prepared the chamber on the rifle and pulled the trigger once more. Again, the weapon did not fire. BRODIE repeated the process and pulled the trigger yet again. Again, the weapon did not fire. The troopers realized that BRODIE's weapon did not have a magazine and was not loaded with ammunition. BRODIE eventually put his weapon down and the troopers took him into custody.

12. After BRODIE was taken into custody on or about September 20, 2017, NJSP detectives contacted CW-1 to learn more information about BRODIE. CW-1 advised that BRODIE is a military veteran who suffers from Post Traumatic Stress Disorder. CW-1 stated that BRODIE was angry at the Office of Veteran's Affairs and at a member of Congress (hereinafter "the Congressman") because BRODIE thought they had not treated him well and had failed to act on BRODIE's behalf.

13. CW-1 also advised that BRODIE had sent CW-1 erratic text messages on or about September 19, 2017. In these text messages, which I later reviewed, BRODIE stated that he had threatened the life of the Chief of Staff of the Congressman in New Jersey. BRODIE also stated his belief that he was going to be investigated by the United States Secret Service, and he told CW-1, in sum and substance, that he wouldn't go down without a fight. BRODIE also stated to CW-1 that BRODIE would shoot any police officers responding to his residence and then he would travel to the Congressman's office in New Jersey, where he would shoot any staff members who were present in the office.

14. CW-1 told law enforcement officers that CW-1 believed BRODIE owned approximately eight (8) guns and kept them in his trailer. CW-1 further stated to the law enforcement officers that on September 19, 2017, BRODIE had stated that before he would kill himself, he intended to have a "blood bath" and kill everyone at the Congressman's office in New Jersey, including the Congressman.

15. CW-1 stated that CW-1 believed that on September 20, 2017, BRODIE was attempting to commit "suicide by cop" because BRODIE had told CW-1 that if any police officers arrived at his residence, he was going to "take out all the responding cops." CW-1 stated that CW-1 was hesitant to call law enforcement about BRODIE because she feared for the safety of the responding officers and did not want any of them to get killed.

5

16. On or about September 20, 2017, NJSP executed a search warrant at BRODIE's residence. During the search, NJSP seized various weapons and ammunition, including three (3) rifles of varying caliber, two (2) handguns, and three (3) 30 round, high-capacity magazines.

17. Further investigation by the FBI and the United States Capitol Police ("USCP") revealed that back on or about September 19, 2017, BRODIE had called the Congressman's office in New Jersey and had threatened to kill the Congressman's Chief of Staff. Specifically, law enforcement learned from members of the Congressman's staff that at approximately 1:30 p.m. on September 19, BRODIE made repeated calls to the Washington Office of the Congressman in an effort to locate the Congressman's Chief of Staff. The staff of the Congressman's Washington office made several attempts to transfer BRODIE's call to the Congressman's Chief of Staff, who was in the Congressman's New Jersey office at the time. Each time the staff attempted to transfer BRODIE, the call became disconnected, and BRODIE would call back even more agitated than before.

18. By the time that BRODIE and the Congressman's Chief of Staff finally connected on the phone, BRODIE was highly agitated. BRODIE began using verbally aggressive language toward the Congressman's Chief of Staff, including words like "motherfucker" and "cocksucker." BRODIE also emphasized to the Congressman's Chief of Staff that the Congressman's Chief of Staff's name, residence address, and social media accounts, and all those of the Congressman's Chief of Staff's family, could be found online. BRODIE threatened to go to the media with his story about the Veterans Administration, and the Congressman's Chief of Staff said that BRODIE was free to make a report to the media. BRODIE responded, in sum and substance, "you're a dead man," and abruptly ended the call. Based on my training and experience as a law enforcement officer, and in the context of this case, I believe this communication was a threat against the Congressman's Chief of Staff and possibly against the Congressman's Chief of Staff's family as well.

19. Moments after the telephone call between BRODIE and the Congressman's Chief of Staff, BRODIE sent an email to two employees of the Congressman. The email read, in sum and substance, "I'd love to have that face to face with the congressman. If not today, that's fine....I'm still acclimating myself to this Google earth App. See where your office is and how easy it is to find?...It even shows the environment and surrounding terrain, parking lots, wooded areas, etc., (like the kind a highly trained Combat Infantryman would use)...." Based on my training and experience as a law enforcement officer, and in the context of this case, I believe this communication was a threat against the life of the Congressman and all of the employees in his office.

20. Law enforcement continued to investigate and learned that back on September 15, 2017, BRODIE had sent an email to the two employees referenced above. The subject was entitled "Congressman ... PLEASE READ THIS." The message read "Sir, I sent you a fax. Fuck you. My next message is a "FIX THE VA" t-shirt to your family and office. I'm sure you take your work home too but I gotta make sure you take it home because I'm going to make sure that you get shit delivered to your home address to make sure that you know veterans are being ABUSED and if you have any problem you just ask [one of the employees]. Hell hath no fury...You have no idea. I just want to remind you...you and all of your staff, your family, your friends..." Based on my training and experience as a law enforcement officer, and in the context of this case, I believe this communication was a threat against the life of the Congressman and all of his "staff...family...friends."

21. On September 25, 2017, FBI agents received consent from CW-1 to download texts messages, pictures, and videos contained in text messages from CW-1's cellular telephone "I Phone 7" with telephone number ending in -4791. The agents conducted a logical extraction from CW-1's cellular telephone, using a Cellebrite cell phone forensic device, and viewed numerous text messages between BRODIE and CW-1. Among these text messages were the following:

    a. 09/19/2017 19:56 Incoming text from Brodie (in sum and substance) "I wanna die in a gunfight. I won't surrender...it's not in me"

    b. 09/19/2017 19:57 Incoming text from Brodie (in sum and substance) "They'll come to me tonight. I'm prepared"

    c. 09/19/2017 19:57 Incoming text from Brodie (in sum and substance) "I'll give them a chance to leave, if not...it'll be first Blood par"

    d. 09/19/2017 19:56 Incoming text from Brodie (in sum and substance) "I wanna die in a gunfight. I won't surrender...it's not in me. I'll give them a chance to leave, if not...it'll be first Blood part II type shit (in case you never saw that Rambo movie)"

    e. 09/19/2017 19:58 Incoming text from Brodie (in sum and substance) "I will die for my American principles"

    f. 09/19/2017 21:27 Incoming text from Brodie (in sum and substance)

"I threaten the life of a congressman's chief of staff.  I'm pretty sure the secret service are going to investigate.  I'm filling sandbags now to have a bunker by my house.  I'm not gonna go down without a fight[.]"

22. On or about September 26, 2017, an agent from the FBI and an agent from the USCP traveled to the Cumberland County Jail in Bridgeton, New Jersey to interview BRODIE.  After the agents advised BRODIE of his <u>Miranda</u> rights, BRODIE waived his rights and agreed to be interviewed.  During the interview that ensued, BRODIE admitted to making the above-described threats over the phone and in electronic communications.