

|  |  |  |
|---|---|---|
|  | U.S. Department of Justice | |
|  | *United States Attorney* | |
|  | *District of New Jersey* | |

| *Craig Carpenito* | CAMDEN FEDERAL BUILDING & U.S. COURTHOUSE | 856/757-5026 |
|---|---|---|
| *United States Attorney* | 401 Market Street, 4th Floor | Fax: 856/968-4917 |
|  | Post Office Box 2098 | Camden NJ  08101-2098 |

*Sara A. Aliabadi*
*Assistant United States Attorney*

August 10, 2018

**Via ECF**
Honorable Noel L. Hillman
United States District Judge
Mitchell H. Cohen Courthouse
One John F. Gerry Plaza
4th & Cooper Streets
Camden, NJ 08101

   Re: United States v. Joseph Brodie, No. 18-162

Dear Judge Hillman:

  Over the last several weeks, the Court has held five pretrial motions hearings in the above-captioned matter.  During these hearings, both parties have presented a large amount of evidence into the record, including the testimony of several witnesses as well as testimony of the defendant himself.  The parties also have submitted a substantial amount of briefing regarding the pretrial motions and have made various oral arguments to the Court.

  At the hearing on August 6, 2018, the Court ordered the parties to file additional submissions summarizing their positions on the pending motions.[1]  Please accept this letter brief setting forth the positions of the United States.[2]

---

[1] The United States observes that the Court already denied the defense motion to exclude evidence of the armed standoff that took place on September 20, 2018.  See 7/6/18 Hr'g Tr. at 50.  The Court made this ruling following the Government's oral representation that it would only seek to admit evidence of the defendant's contemporaneous possession of firearms and ammunition and would not seek to admit any other evidence from the armed standoff.  See id. at 39-50.  Accordingly, this defense pretrial motion is no longer pending before the Court.

[2] The United States incorporates all of its prior briefing and letter submissions regarding the pending pretrial motions, other than with respect to any positions that the United States modified on the record during the various pretrial motions hearings (namely, positions regarding evidence of the armed standoff and the content of jury instructions).

I. Motion to exclude prior bad acts or, alternatively, a motion for prompt disclosure of material under Federal Rule of Evidence 404(b)

The United States submits that this motion should be denied as moot and/or premature based on the pretrial deadlines schedule that the parties proposed to the Court during the August 6, 2018 hearing.

In this schedule, the parties suggested that the Court order the Government to disclose its exhibits by August 27, 2018 and to disclose any evidence under Rule 404(b) by September 4, 2018. These deadlines are reasonably prompt in light of the overall context of this case, particularly because the Government believes that it already has disclosed all materials in its possession that the defense may choose to characterize as 404(b) evidence. See also Government Mem. of Law in Resp. to Def. Pretrial Mot. at 32-38.

If the defense objects to the admission of any of the Government's evidence, or believes that any of the Government's exhibits constitute evidence under Rule 404(b), the defense has ample time to raise this issue with the Court including by filing a motion in limine by September 10, 2018.

II. Motion to exclude evidence recovered from Brodie's electronic devices

The Government is not clear whether the defense still is pursuing its motion to exclude evidence recovered from Brodie's electronic devices. See 7/6/18 Hr'g Tr. at 94 (defense counsel stating that "I gather the government has cracked two of the four devices and I'm about to receive I gather the contents, and so I'll know more after I have them examined to see if there's anything in there that needs to be suppressed. And we're also I think working on some practical accommodation as to the other two devices that might moot the motion. So, I would say if the Court is amenable, we don't need to resolve those today."); see also 7/16/18 Hr'g Tr. at 14-30. To the extent that this motion remains under consideration, it should be denied by the Court.

In any event, the defense has not offered any facts or law to suggest that the device search warrants were in any way defective under the governing law. At most, the defense has demonstrated that (1) the Government arguably included four paragraphs in its 47-paragraph search warrant affidavit that constitute surplusage, and therefore may be stricken by the Court with no effect on the warrant's overall search authority, and/or (2) the governing caselaw in this area is troubling to the defense, on a philosophical level, because it allows the Government to execute search warrants on cellphones that may contain personal, non-criminal information. See Government Mem. of Law in Resp. to Def. Pretrial Mot. at 38-43.[3] Neither of these points, even if true, counsels in favor of suppressing evidence recovered from Brodie's devices. Id.

---

[3] Brodie believes there is an overarching "need to recalibrate Fourth Amendment protections for the digital age," and he states that "[t]he United States Supreme Court has yet to articulate fully a Fourth Amendment jurisprudence that" – in Brodie's opinion, would – "reflect the new realities of electronic devices and the digital world." Def. Mem. in Supp. of Pretrial Mot. at 17.

The Government notes the defendant's testimony that he has evidence that he "looked forward to providing" to the Government "to show that the [search warrant] affiant either intentionally or deliberately misrepresented the events to obtain the search warrant and the arrest warrant." See June 29, 2018 Hr'g Tr. at 112. It is not clear to the Government if the defendant was speaking only about the state search warrant of his home, which was executed on the day of his arrest, or if the defendant also was speaking about the federal search warrants for his electronic devices, which were obtained and executed months after his arrest.

Evidence of deliberate misrepresentation in a search warrant affidavit, if credible, theoretically could provide a basis for suppressing the search warrant. No such evidence has been provided to the Court or the Government, however, and the Government submits that no such evidence exists. Accordingly, there is no reason for the Court to question the validity of any of the search warrants in this case, and the Court should deny the defense motion regarding same.

III.   Motion to suppress taped statement

    A.   The Sixth Amendment was not violated

At the hearing on July 6, Brodie essentially abandoned any argument that he invoked his rights under the Sixth Amendment. Regardless – and as the Government argued in its brief in opposition to pretrial motions, again during the July 6 hearing, and again during its July 10 supplemental submission to the Court – the Sixth Amendment does nothing to assist Brodie in his federal case. This is because (1) Brodie's rights under the Sixth Amendment are offense-specific; and (2) those rights had not attached at the time that Brodie gave his statement to federal law enforcement agents on September 26, 2018. See Government Mem. of Law (Docket Entry No. 37) at 15-19 (citing cases).

    B.   The Fifth Amendment was not violated

        1.   A Fifth Amendment invocation requires both custody and interrogation

The caselaw is clear that an invocation of rights is not operative for Fifth Amendment purposes unless it is made during custodial interrogation or when such interrogation is "imminent." See Government Mem. of Law (Docket Entry No. 37) at 19-22 (citing cases). Thus, for a claimed invocation to be relevant under the Fifth Amendment, the Court must first conduct two inquiries: one involving whether the defendant was in *custody*, and one involving whether the defendant was being (or was right about to be) *interrogated*. And, of course, the Court must inquire as to whether the defendant actually made an unambiguous request for counsel, as required by the caselaw on invocation.[4]

---

[4] In Brodie's testimony on July 6, 2018, he clarified that he invoked his right to counsel on September 20 but did not invoke his right to remain silent. See, e.g., 7/6/18 Hr'g Tr. at 74. Accordingly, this letter submission only examines the Fifth Amendment right to counsel, although a similar analysis may be performed for claimed invocations of the right to remain silent.

      2.      While Brodie was in custody, he never faced interrogation.

Brodie testified at length over the course of the pretrial motions hearings, and not once did he claim that any law enforcement officers actually interrogated him between the time he was brought into custody on September 20, 2017 and the time he gave his taped statement on September 26, 2017.  Although Brodie now claims to have invoked his rights on September 20 in the context of custodial interrogation, Brodie specifically acknowledged that the local officers with whom he interacted on September 20 *refrained* from interrogating him.  See 7/6/18 Hr'g Tr. at 61-62 (defendant agreeing that state police did not question him from the time of his arrest to the time he appeared in court and stating "they did not make any attempt whatsoever to interrogate me").

This is consistent with the video and audio footage from Brodie's transport away from the scene of his arrest, which depicts Brodie constantly speaking and asking questions of the transporting officers, without any interrogation by them.  See id. at 65-67 (discussing content of transport video).   This also is consistent with Brodie's own taped statement, his fiancée's taped statement and under-oath testimony, Brodie's pretrial motions briefs, Brodie's psychological evaluation, and various other submissions since his arrest, none of which stated anything about an interrogation (or even attempted interrogation) on September 20, 2017.

The closest that Brodie comes to alleging that any officers interrogated him while he was in custody on September 20 and the early hours of September 21, was in the Reply brief that Brodie filed on June 25, 2018.  There, Brodie stated that "it appears that state authorities attempted to interview [Brodie] earlier as indicated by an advice of rights form."  See Def. Reply in Supp. of Pretrial Mot. at 2.  But, this statement was nothing more than an unwarranted, unsupported speculation by the defense, and it was later contradicted by Brodie's own testimony that the authorities never sought to interrogate him on September 20.  See 7/6/18 Hr'g Tr. at 61-62.  It also was contradicted by the testimony of all seven law enforcement witnesses that the Government presented during the pretrial motions hearings, who testified that they never interrogated (or even sought/wished to interrogate) Brodie on September 20.  See generally 7/16/18 Hr'g Tr. & 7/26/18 Hr'g Tr. (presenting trooper and officer testimony).  In short, the weight of the evidence and authority reflects that Brodie was never interrogated on September 20 or 21.[5]

---

     [5]     The defense may argue that Brodie properly invoked his rights because he claimed to have requested counsel when interrogation was "imminent."  See Alston v. Redman, 34 F.3d 1237 (3d Cir. 1994) (suggesting that a suspect's request for an attorney at the time he is read his Miranda rights may, under some circumstances, constitute an invocation of rights under the Fifth Amendment).  To that end, the Government points out that "imminent" interrogation appears to require, as a prerequisite, that a suspect already is in custody.  See id. at 1248-49 (discussing a North Carolina Supreme Court case and a Tenth Circuit Court of Appeals case where suspects in custody were deemed to have invoked their Fifth Amendment rights based on "imminent" interrogation).  Thus, Brodie's testimony regarding his first supposed request for counsel on September 20 ("no warrant, no lawyer, no talky," etc.) was not sufficient to invoke his Fifth Amendment rights.  See 7/6/18 Hr'g Tr. at 59, 68.  At that particular time, Brodie was at his own home, unrestrained, with access to firearms; he clearly was not in custody.  As for

     3.  Brodie never invoked his rights under the Fifth Amendment

  During Brodie's testimony, he claimed to have invoked his right to counsel on September 20, 2018, by repeatedly telling law enforcement officers that he wanted to call a lawyer.[6] See, e.g., 7/6/18 Hr'g Tr. at 60.  Even though the Government believed these claims were incredible on their face and failed to meet the standard for requiring an evidentiary hearing, the Government did not object to the Court holding an evidentiary hearing in order to allow both parties to further explore the defendant's claims.  See 7/6/18 Hr'g Tr. at 51-53 (explaining that the standard for an evidentiary hearing is not met under the governing law); Government Letter Br. dated July 10, 2018 (Docket Entry No. 49) (consenting to an evidentiary hearing despite the lack of specificity and lateness of defendant's invocation claims); see generally 7/16/18 Hr'g Tr. & 7/26/18 Hr'g Tr. (presenting trooper and officer testimony in the context of evidentiary hearings).

  Over the course of the next two hearings, the Government presented the testimony of seven different law enforcement witnesses in order to address Brodie's eleventh-hour, unsupported claims of invocation.  These seven law enforcement witnesses, comprised of both state troopers and detectives, testified about all of their interactions with Brodie on September 20 and 21.  The witnesses testified about their interactions with Brodie at the scene of his arrest; their interactions with Brodie during his transport away from the scene of his arrest (which also was memorialized in video and audio footage); their interactions with Brodie at the police station, including during the reading of Brodie's Miranda rights and Brodie's execution of the Advice of Rights form; their interaction with Brodie during his transport to and from Inspira Medical Center, and their interaction with Brodie while Brodie was at Inspira Medical Center.  The testimony of each officer made sense and was corroborated by other officers' testimony as well as by other evidence in the case, such as the Advice of Rights form, various law enforcement reports, video/audio transport footage, and other evidence.  Although some of the officers remembered more details about Brodie's September 20 arrest than other officers, *all of the officers testified that Brodie never requested a lawyer during this time*.

---

Brodie's claims that he unambiguously invoked his Fifth Amendment rights at later points in the day on September 20, see, e.g., id. at 60 – those claims are not credible on their face, and they are not credible in light of all the other testimony and presented during the pretrial hearings, as discussed further herein.

 [6] In Brodie's pretrial briefing, he also claimed to have invoked his rights under the Fifth Amendment by completing a state appointment-of-counsel intake sheet so that he could receive the appointment of counsel in future state proceedings regarding weapons charges.  But, as the Government previously explained, Brodie's completion of this state intake sheet was insufficient to trigger a Fifth Amendment violation because it did not involve any custodial interrogation.  See Government Mem. of Law at 19-22 (citing cases).

 It appears that the defense now has abandoned this "invocation intake sheet" argument in favor of an argument that Brodie invoked his rights on September 20, within the context of custodial interrogation.  However, to the extent that the defense still is pursuing an invocation intake sheet argument, this argument should be rejected by the Court.

This makes sense. Brodie is not a person who shies away from providing comprehensive answers to questions and offering information without any prompt. On several occasions, Brodie has volunteered information to law enforcement officers and to the Court without any questions pending. See e.g., Brodie transport video from 9/20/17; Brodie taped statement from 9/26/17; 6/29/18 Hr'g Tr; 7/6/18 Hr'g Tr. If Brodie actually had invoked his right to a lawyer on September 20, surely he or his counsel would have mentioned that fact at some point during the ten months that followed. Brodie gave a taped statement to federal officers on September 26; he subsequently appeared in federal court several times, with the assistance of able counsel; he gave an interview to his hired psychological expert; he submitted several briefs in the context of motions for release and pretrial motions; and he personally testified during two pretrial motions hearings. At any or all of these points, all of these points, Brodie and his counsel could have raised the issue of Brodie's supposed invocation on September 20. And yet, they did not do so.

A similar point may be made with respect to Brodie's fiancée, Dana Mednick. Over the course of this case, Ms. Mednick has had ample opportunity to mention Brodie's supposed invocation of rights on September 20. Ms. Mendick voluntarily gave a lengthy taped statement about Brodie to state officers shortly following Brodie's arrest; she later adopted that statement as true, and offered additional testimony, before the Grand Jury; and she ultimately offered additional in-court testimony at hearings before this Court as well as before United States Magistrate Judge Joel Schneider.

At all of these points, Ms. Mednick could have informed law enforcement officers – or the Court – about Brodie's supposed invocation on September 20. But, not until July 26, 2018, did Ms. Mednick suddenly claim that Brodie had "invoked" his right to an attorney on the night of his arrest by speaking to her late at night on September 20 and asking her to get him an attorney, after which (according to Ms. Mednick) "the line went dead." See 7/26/18 Hr'g Tr. at 62-63.[7] See also id. at 58-75 (providing additional testimony regarding Brodie's supposed invocation).

This testimony is incredible on its face, for much the same reasons as Brodie's testimony is incredible. Ms. Mednick, like Brodie, has offered information to authorities on multiple occasions. It was Ms. Mednick who originally called law enforcement to check on Brodie's well-being on September 20. Within the next 24 hours, Ms. Mednick voluntarily gave law enforcement officers information about Brodie's prior drug and alcohol abuse, she showed the authorities the text messages in which Brodie confessed to the charged crimes, and she described the phone conversation with Brodie in which he admitted to threatening the Congressman's

---

[7] Ms. Mednick testified that while she was on the phone with Brodie, he asked her to get him an attorney. 7/26/18 Hr'g Tr. at 69-73. Ms. Mednick then reasoned that law enforcement must have been present with Brodie to hear his supposed attempt at invocation, because the last time she herself had seen Brodie, he was in handcuffs. Therefore, according to Ms. Mednick, in order for Brodie to speak to her on the phone, "they" must have been holding the phone up to his ear. Id. The Government submits that even if Ms. Mednick's testimony on this point were credible, which it is not, Ms. Mednick has no knowledge of whether any law enforcement officers actually were present to hear Brodie ask Ms. Mednick to obtain an attorney for him.

6

Chief of Staff and "basically said that he is going to slaughter and kill with his own hands, he's bringing all of his weapons with him, and he has a lot, he has automatic rifles I mean, you could see that was like an AK-47, he has, you know, shotguns, he has handguns." See Mednick taped statement. Ms. Mednick was subsequently interviewed by federal authorities and provided additional information. As Ms. Mednick has demonstrated over the course of this case, she does not hesitate to speak about Brodie and/or offer testimony to this Court. And yet, before July 26, 2018, she too had never mentioned anything about Brodie asking her for a lawyer on September 20.[8]

Given Ms. Mednick's obvious devotion to Brodie and her willingness to provide information about Brodie, she surely would have said something if Brodie had asked her to get him an attorney over the phone, and then the phone line had immediately gone dead. As Brodie's fiancée, Ms. Mednick would have been worried about Brodie. Given Ms. Mednick's knowledge of Brodie's medical issues, she would have been concerned that something bad might have happened. She would have called back the police station, or even called 911. And yet, as Ms. Mednick's own phone records demonstrate – she did none of this after her late-night phone call with Brodie. See 7/26/18 Hr'g Tr. at 64 (receiving Def. Exh. A into evidence). The next day, she supposedly made some calls to attorneys, and she exchanged at least one email with one of Brodie's friends who was also an attorney.[9] That's all.

The Government observes that neither Brodie nor Ms. Mednick ever mentioned *anything* about any alleged invocation of rights on September 20 until *after* they read the Government's briefing regarding the Fifth and Sixth Amendments, and *after* they realized that Brodie's other claimed "invocations" of rights were inoperative under McNeil v. Wisconsin, 501 U.S. 171 (1991) and its progeny.[10] Only then did Brodie and Ms. Mednick attempt to circumvent the governing caselaw on invocation by testifying in a manner that, they believed, would result in suppression of Brodie's taped statement.

---

[8] Ms. Mednick admitted that she had spoken to defense counsel "several" times over the course of Brodie's case. When she was asked when she had first talked to counsel about Brodie's supposed invocation on September 20, Ms. Mednick stated, "We just spoke about it." When Ms. Mednick was pressed further about when she *first* told defense counsel about Brodie's supposed invocation, Ms. Mednick stated that she "could not recall." See 7/26/18 Hr'g Tr. at 74-75.

[9] Notably, this is the same friend who had prompted Ms. Mednick to call the authorities in the first place on September 20, out of concern that Brodie was suicidal.

[10] The first time that Brodie notified the Government that he was seeking to prove an alleged invocation of rights from his actions on September 20 was in an email sent by defense counsel to the undersigned on the evening of June 28 – the night before the scheduled June 29 hearing on defense pretrial motions. See 6/29/18 Hr'g Tr. at 69-73 (counsel and Court discussing how, the night before the pretrial motions hearing, the defense claimed for the first time that Brodie had invoked his rights on September 20, 2017).

In the context of this case, and in light of all the other evidence that has been presented to the Court, the Government submits that neither Brodie's testimony nor Ms. Mednick's testimony about invocation is credible. Rather, the facts demonstrate that Brodie never invoked his rights under the Fifth Amendment, and there is no reason to suppress his taped statement. Accordingly, the defense motion on this point should be rejected.

Thank you for your attention to this matter.

                                                       Respectfully submitted,

                                                       CRAIG CARPENITO
                                                      United States Attorney

                                                      *s/Sara Aliabadi*
                                       By:    SARA A. ALIABADI
                                                      Assistant United States Attorney

cc:   Ralph Jacobs, Esquire