UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | Honorable Noel L. Hillman |
| v. | : | |
| | : | No. 18-162-NLH |
| | : | |
| JOSEPH BRODIE | : | |

**RESPONSE OF THE UNITED STATES**
**TO DEFENDANT'S SECOND MOTION FOR A NEW TRIAL**

I.     INTRODUCTION

      Approximately one year ago, defendant Joseph Brodie attempted to overturn a jury's unanimous verdict convicting him of two counts of threatening to murder a United States Congressman and his staff.   He filed a post-trial motion for a directed verdict of acquittal and, in the alternative, a motion for a new trial.   See Docket Entry No. 109.   The Government subsequently filed a lengthy response to Brodie's post-trial motions.   See Docket Entry No. 117.   After considering the parties' positions, the Court denied Brodie's motions and set the matter for sentencing.

      Now, on the eve of Brodie's sentencing hearing – Brodie has filed yet another meritless motion for a new trial.   See Docket Entry No. 167 ("Def. Mot.").   Once again, Court should deny Brodie's attempt to overturn the unanimous jury verdict.   The evidence upon which Brodie relies is not "newly-discovered evidence," as Brodie claims, and it is utterly irrelevant to the issues at trial.[1]

---

[1]     Because the parties already have briefed the procedural history and the applicable standards for post-trial motions, the Government will not again summarize all the applicable

1

II.      The Photographs and Facsimile Records

Brodie relies upon a series of photographs that he claims to have received from his attorney in a state case concerning the registration of firearms, together with some fax records and a related Certification from his state defense counsel.    See Def. Mot. at 1 (citing Exhibit A). Brodie's argument appears to be that (1) if Brodie had only seen these photos and fax records earlier, then (2) Brodie would have pushed harder to convince his federal trial counsel Ralph Jacobs, Esquire, to present the photos and fax records at trial, and then (3) the photos and records somehow would have convinced the jury to refrain from convicting Brodie.    As the Government understands Brodie's argument, the photos are important to Brodie because they reflect that (1) not *all* of Brodie's firearms were assembled and operable on the date he committed his threat crimes, and (2) Brodie had security cameras mounted at his house on the day of his arrest, which was consistent with Brodie's testimony at various pretrial motions hearings.    Meanwhile, according to Brodie, the fax records are important because they ostensibly show that Brodie was in the process of properly registering his firearms in New Jersey – such that his mere possession of the firearms in New Jersey may not have been illegal.

There are various problems with Brodie's arguments and his reliance on the items contained in Exhibit A.    At the outset, none of the photographs from the state search warrant execution were presented by the Government at trial or were strictly contained within the required Rule 16 discovery in Brodie's federal threat case.    It is not clear that the Government

---

facts and legal standards for a motion for new trial.    The Government simply will address the alleged factual issues that Brodie recently has raised and the exhibits that Brodie recently has filed.

In taking this approach, the Government notes that Brodie's latest post-trial motion contains no summary of procedural history or discussion of legal standards.

had any obligation whatsoever to seek them or to produce them to Brodie.

But, regardless of the applicable legal obligations – the Government *did* obtain and produce the state search warrant photos to Brodie early in the discovery process and prior to Brodie's indictment.   Indeed, some of the exact same photos that Brodie attaches as so-called "newly discovered evidence" were *also* attached to the Government's response to Brodie's first motion for release in February of 2018.   See Docket Entry No. 23.   As reflected in Brodie's pretrial arguments, Brodie and his trial counsel were well aware of the state search warrant that law enforcement officers executed on Brodie's home, together with the attendant search warrant execution photos, long before his trial in the federal matter.

Tellingly, at Brodie's federal threat trial, he did not seek to introduce *any* of the state search warrant photos of unassembled firearms and/or other items recovered from his home.   He did not even seek a delay of trial to further analyze the issue.   Similarly, when Brodie testified at his trial, he did not seek to explain whether each of the firearms was found in an assembled or disassembled state.   Instead, Brodie's trial counsel readily stipulated to the photographs of the assembled firearms at trial[2] and focused his evidence and arguments elsewhere.

The Government imagines that Brodie's trial counsel agreed to the firearms stipulation because counsel deemed the more "sterile" photographs of Brodie's assembled firearms to be *less* prejudicial to Brodie than the state search warrant photos or any other firearms evidence that the Government might seek to use at trial, such as the firearms themselves.   Additionally, Brodie's trial counsel likely agreed to the stipulation because it allowed the jury to infer that

---

[2]    The Government believes that when law enforcement officers recovered a disassembled firearm from Brodie's home, they reassembled that firearm to test it for operability purposes.

Brodie's firearms were recovered in a disassembled state.[3]   In light of the circumstances, Brodie's trial counsel made reasonable, well-informed decisions about legal strategy concerning evidence of Brodie's firearms possession.

Notably, Exhibit A to Brodie's second motion for a new trial contains a couple of photos that the Government does not recognize as being part of the state search warrant execution.   For example, there are some photos that appear to depict the image of Brodie himself and/or that appear to be screen shots from an electronic device to which the Government did not have access.   Similarly, there are some photos that appear to depict footage from a security camera or other device, together with photos that appear to depict a surveillance device and related camera wires.   It is not completely clear where these additional photos came from, or when they were taken, and it is not completely clear how the photos relate to Brodie's argument for a new trial.

Even if some of these photos involve the same security cameras that Brodie mentioned during his pretrial motions testimony – Brodie never introduced any security camera footage in pretrial motions or at trial.   Brodie also did not testify about any such footage during his trial testimony.   To the Government's knowledge, Brodie did not even seek a delay of pretrial motion hearings or trial so that he could have more time to obtain and analyze security footage or develop his strategy.[4]   Ultimately, the issue of whether Brodie had any security cameras

---

[3]     The parties' firearms trial stipulation stated that "[i]f a records custodian from the New Jersey State Police testified under oath, he or she would testify that on and before September 19, 2017, Joseph Brodie possessed and had access to and control of the following firearms at his residence, all of which were operable or readily made operable, as well as ammunition for those firearms," and then proceeded to describe each of the specific firearms at issue.

[4]     The Government understands that there were various pretrial proceedings during which the Government was asked to leave the courtroom so that the Court could address various issues directly with Brodie.   Therefore, it is possible that Brodie discussed some of these issues with

mounted at his home on the day of his arrest was utterly irrelevant to Brodie's trial.    Brodie's citation of these photographs in his second motion for a new trial is nothing more than an eleventh-hour attempt by Brodie to raise a "red herring" and/or preserve meritless issues for appeal.

As for Brodie's argument regarding fax records – that argument also is meritless, albeit for different reasons.    At the outset, the fax records contained in Exhibit A do not contain any substantive communications; they are merely records of transmission.    Indeed, Brodie's entire argument about the records is that they ostensibly show that Brodie "faxed documentation to the State Police on prior occasions."    Def Mot. at 2.    Brodie does not specify what sort of documentation he faxed or how that documentation possibly could relate to the threats of which he was convicted.    The fax transmission records do nothing to support Brodie's argument for a new trial.

Based on Brodie's various in-court statements and prior written arguments – together with the attached Certification of his defense counsel in his state case, see Exhibit A – the Government surmises that Brodie is relying on the fax transmission records to show that, around the same time he made his threats, he was in the process of properly registering his firearms in New Jersey.    Therefore, the argument goes, Brodie's possession of firearms might not itself have been illegal.

Even if that is true, that has absolutely nothing to do with the jury's decision to convict Brodie in the federal threat case.    This is because the Government did not introduce any evidence at trial about the registration status of Brodie's firearms, and that firearms registration

---

the Court outside of the Government's presence.

status is not relevant to Brodie's threats to kill the Congressman and his staff.   The Government

takes no view here on whether Brodie's firearms were properly registered based on New Jersey

law.   That inquiry is properly before a court in the State of New Jersey.

In sum, the Government's introduction of firearms evidence at trial was focused on the

*fact* of Brodie's firearms possession and the victims' knowledge of that possession.   The

*legality* of Brodie's firearms possession may be pertinent to Brodie's state case, but it is utterly

irrelevant here.   At best, the photos and fax transmission records contained in Exhibit A are

marginally relevant to collateral issues that had nothing to do with the jury's unanimous guilty

verdict.   There is nothing exculpatory in these photos or anything that possibly could warrant a

new trial.

III.    The Telephone Records

To further support his motion for a new trial, Brodie cites various records of attempted or

completed telephone calls between himself and Michal Francis.   Brodie points out that certain

records he received prior to trial – such as records taken directly from one of his seized devices –

appear to reflect certain calls between Brodie and Francis.   Meanwhile, other records that

Brodie received prior to trial, such as AT&T billing records, do not appear to reflect these same

few calls.   Def. Mot. at 2-3; Def. Exhibits 2-4.

Brodie's arguments regarding the calls with Michael Francis appear to be twofold.

First, Brodie appears to suggest that the Government conspired to remove a few specific calls

involving Michael Francis from the relevant AT&T billing records, and then somehow tricked

Brodie into presenting those billing records as his defense exhibits at trial.   See Def. Mot at 2-3.

Brodie offers absolutely no support for this suggestion, or even a stated reason why (or how) the

6

Government might have removed a few specific calls from an AT&T billing record.

At trial, both sides readily admitted that Brodie and Francis spoke on the phone in the weeks

leading up to Brodie's threats.[5]   A review of the trial testimony reflects that the existence or

non-existence of a few specific phone calls was simply not important to the parties' trial theories.

Further, despite Brodie's assertions to the contrary, the defense never even sought to admit D-

300 or D-301 at trial, so Brodie's unsupported suggestion of a conspiracy between the

Government and AT&T therefore is insufficient to warrant a new trial.

      Second, Brodie argues that the Government's understandable delay in producing

electronic data to Brodie – which data the Government itself could not access at the time of

production – now requires the Court to grant Brodie a new trial.   Brodie argues that the delay

"amounts to prosecutorial misconduct by denying [Brodie] his right to potentially exculpatory

impeachment evidence regarding the existence of calls prior to his testimony at the motions

---

[5]    Notably, Brodie did not present any evidence or testimony regarding any *particular* calls between him and Michael Francis that possibly could have changed the outcome of his trial, and the Government did not contest any assertions by Brodie at trial regarding any *particular* calls that took place between Brodie and Michael Francis.

    A review of the trial transcript reflects that both Michael Francis and Brodie testified at length about their numerous contacts with one another, but neither individual focused on the specific phone numbers involved.   Brodie testified about exchanging many phone calls with Michael Francis, but Brodie did not specify whether Francis used his personal or work phone for these calls.   Trial Tr. at 349, 59-60, 375-76.   Meanwhile, Michael Francis testified that Brodie used a couple of different telephone numbers to communicate with Francis, and that Francis used the government landline to communicate with Brodie.   Trial Tr. at 37-39.   At one point, the undersigned Assistant United States Attorney asked Francis, "Did you ever use a personal number that you can recall to communicate with Brodie?" and Francis responded "No."   Trial Tr. at 39.   Francis also stated that he did not recall the specifics of all the many contacts that he had with Brodie, and that he does not keep a call log.   Trial Tr. at 92-93.

    Notably, when defense counsel cross-examined Francis at trial, he did not ask Francis anything about whether Francis had ever used a personal phone number to communicate with Brodie.   Trial Tr. at 87-106.   This issue simply was not relevant to any of the issues at trial.

hearing."   Def. Mot. at 3.

Not so.   Brodie has not explained how the evidence of any particular calls between himself and Michael Francis possibly could amount to "potentially exculpatory impeachment evidence" for pretrial motions hearings or for trial itself.[6]   Moreover, even if the evidence could have been used by Brodie on cross-examination of Francis – the record is clear that Brodie had access to the relevant evidence well before trial started.   Any delay in evidence production did not prejudice Brodie.

If Brodie had wished to file any motions about delays in pretrial production of electronic evidence – he surely could have done so.   Prior to trial, the Court repeatedly had demonstrated its willingness to allow Brodie to file additional motions and to conduct additional evidentiary hearings.   Indeed, here the Court conducted *several* pretrial motions hearings, at which the Court allowed Brodie to present evidence and testimony – far beyond what was required under the law.

Alternatively, if Brodie had simply wanted more time before trial so that he could analyze the evidence of phone calls between himself and Michael Francis – he surely could have requested more time.   And, the Court surely would have granted that request.   Indeed, it was the *Government*– not Brodie – that filed a motion to continue the trial date in this matter, in accordance with the Court's Standing Order.   Last Fall, Brodie made it abundantly clear that he

---

[6]      If Brodie is once again referring to alleged sexual and inappropriate communications that he claims to have received from Michael Francis, as he described in his pretrial motions testimony, then the Government submits that such communications would not qualify as "potentially exculpatory impeachment evidence."   Moreover – other than Brodie's self-serving testimony – there is no evidence that any such sexual or inappropriate communications were ever exchanged between Brodie and Francis.

did not need any additional time to prepare and that he wished to proceed to directly to trial.   He cannot now second-guess that decision.

Curiously, Brodie fails to acknowledge that he and his counsel were themselves largely responsible for the same production delay about which he now complains.   As the Government described in its response to Brodie's original pretrial motions, the Government attempted to work with Brodie's trial counsel so that Brodie could have access to *all* of his electronic data prior to the hearing on pretrial motions.   See Docket Entry No. 37 at 42-43 (describing efforts to come to resolution with Brodie's trial counsel).   Indeed, in early May 2018 – *five months* before Brodie's trial in this matter – the undersigned Assistant United States Attorney attempted to construct a procedure wherein the Government would produce downloads of Brodie's devices to his trial counsel *without searching them first,* so that Brodie's trial counsel could identify and produce only those items that he believed, in good faith, were responsive to the authorized search warrants.   Id.   Brodie's trial counsel did not wish to follow the Government's suggested procedure, and he ultimately negotiated a different procedure that he felt was more beneficial for Brodie.   See Docket Entry 161.

Even though the Government could not access all the electronic data that it had lawfully seized from Brodie prior to trial, the Government sought to produce that same data to Brodie so that he could prepare his own defense.   The logistics of this production obviously caused some delay, but Brodie has not shown that the delay prejudiced him in any way.   Brodie has not shown that the minor differences between the calls reflected on the AT&T billing records and the calls reflected on one of Brodie's own electronic devices had any bearing whatsoever at trial.[7]

---

[7]         The Government observes that the three calls Brodie identified as missing from the

IV.    <u>CONCLUSION</u>

For the reasons set forth above, defendant Joseph Brodie's second motion for a new trial should be denied.

Respectfully submitted,

CRAIG CARPENITO
United States Attorney

*s/ Sara A. Aliabadi*
SARA A. ALIABADI
JASON M. RICHARDSON
Assistant U.S. Attorneys

---

AT&T billing records, were calls that lasted for *under a minute*.   <u>See</u> Def. Mot. at 3 (citing Ex. B, specifically call nos. 29, 41, and 42).   Meanwhile, the other two calls that Brodie identifies, which were are reflected on the AT&T billing records, were calls that lasted for *over a minute*. <u>See</u> Def. Mot. at 3 (citing Ex. B, specifically call nos. 27 & 40).

It seems likely that, as a matter of practice, AT&T does not list *any* calls in its billing records that last for less than a minute.   Accordingly, it is likely that the alleged discrepancy that Brodie identifies may be easily explainable by AT&T's own billing and record-keeping practices, rather than by any nefarious conduct on the part of the Government.

As for the calls that allegedly are reflected on Exhibit D but "missing" from the AT&T records – based on the history of this case, the Government believes that the Cornerstone records contained in Exhibit D are for a different electronic device than the device covered by the AT&T billing records.   Regardless, Brodie does not identify any meaning, fault, or motive behind the so-called "missing" numbers to justify his second motion for a new trial.